11-4376-cv
Morning Mist Holdings Ltd. v. Krys

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2012

(Argued: November 19, 2012     Decided: April 16, 2013)

Docket No. 11-4376

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of: Fairfield Sentry Limited,

> Debtor,

MORNING MIST HOLDINGS LIMITED, MIGUEL LOMELI,

> Appellants,

> - v.-

KENNETH KRYS, CHRISTOPHER STRIDE,

> Appellees.

- - - - - - - - - - - - - - - - - - - - -x

Before:      JACOBS, Chief Judge, WINTER, Circuit Judge, SWAIN, District Judge.[*]

Morning Mist Holdings Limited and Miguel Lomeli appeal from the judgment of the United States District Court for the Southern District of New York (Daniels, J.), affirming

---

[*] The Honorable Laura Taylor Swain, United States District Judge for the Southern District of New York, sitting by designation.

the order of the United States Bankruptcy Court for the Southern District of New York (Lifland, J.), which determined that the debtor in this case, Fairfield Sentry Limited, had its center of main interests in the British Virgin Islands, and therefore recognized Fairfield Sentry's liquidation in the British Virgin Islands as a "foreign main proceeding" under 11 U.S.C. § 1517.  We affirm.

ROBERT A. WALLNER, Milberg LLP, New York, New York (Kent A. Bronson, on the brief; Stephen A. Weiss, Seeger Weiss LLP, New York, New York, on the brief), for Appellants.

DAVID J. MOLTON, Brown Rudnick LLP, New York, New York (Daniel J. Saval, May Orenstein, Kerry L. Quinn, on the brief), for Appellees.

DENNIS JACOBS, Chief Judge:

The question presented is where the debtor in this bankruptcy proceeding had its "center of main interests" within the meaning of Chapter 15 of the Bankruptcy Code (enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005).  The answer determines whether the pending foreign bankruptcy proceeding is a "foreign main proceeding," in which event U.S. proceedings against the debtor are stayed.  Morning Mist Holdings

Limited and Miguel Lomeli (collectively, "Morning Mist") appeal from the judgment of the United States District Court for the Southern District of New York (Daniels, J.), affirming the order of the United States Bankruptcy Court for the Southern District of New York (Lifland, J.), which determined that the debtor, Fairfield Sentry Limited ("Sentry"), had its "center of main interests" in the British Virgin Islands ("BVI"), and therefore recognized Sentry's liquidation in the BVI as a "foreign main proceeding" under 11 U.S.C. § 1517.  For the following reasons, we affirm.

To determine the proper "center of main interests" ("COMI," as the term is abbreviated by the parties and other courts), we consider the relevant time period for weighing the interests, and the principles and factors for determining which jurisdiction predominates.  We conclude (as did the bankruptcy court and the district court) that the relevant time period is the time of the Chapter 15 petition, subject to an inquiry into whether the process has been manipulated.  The relevant principle (for which we consult foreign law, as directed by the statute) is that the COMI lies where the debtor conducts its regular business, so

3

that the place is ascertainable by third parties.  The statute includes a presumption that the COMI is where the debtor's registered office is found.  Among other factors that may be considered are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes.

## BACKGROUND

Sentry was organized in 1990 as an International Business Company under the laws of the BVI.  From 1990 until Bernard Madoff's arrest on December 11, 2008, Sentry was the largest of the "feeder funds" that invested with Bernard L. Madoff Investment Securities LLC ("BLMIS").  Roughly 95% of Sentry's assets were invested with BLMIS, totaling over $7 billion.

Pursuant to its Memorandum of Association, Sentry administered its business interests from the BVI, where its registered office, registered agent, registered secretary, and corporate documents, among other things, were located. Sentry's Board of Directors oversaw the management, with day-to-day operations handled by an investment manager,

Fairfield Greenwich Group ("FGG"), based in New York.[2] Sentry's three directors, Walter Noel, Jr., Jan Naess, and Peter Schmid, resided in New York, Oslo, and Geneva, respectively.

When Madoff was arrested, Sentry's two independent directors, Naess and Schmid, suspended all share redemptions. (Noel was recused from that meeting as the owner and principal of FGG, Sentry's investment manager.) Over the ensuing months, Naess and Schmid focused on winding down Sentry's business and preserving assets in anticipation of litigation and bankruptcy. From December 2008 to July 2009 (when Sentry entered liquidation in the BVI), they participated in approximately 44 teleconference board meetings initiated by Sentry's registered agent in the BVI. During this time, Naess and Schmid advised Sentry's shareholders as to measures being taken in response to the Madoff scandal. That correspondence issued from Sentry's address in the BVI, as shown on the letterhead.

In February 2009, Naess and Schmid constituted themselves as a litigation committee with the authority to

---

[2] Fairfield Greenwich (Bermuda) Ltd., a member company of FGG, served as Sentry's investment manager. We refer to those entities collectively as "FGG."

(among other things) consider, commence, and settle litigation to be taken by or against Sentry. Sentry would subsequently become engulfed in lawsuits.

In May 2009, Morning Mist, a Sentry shareholder, filed a derivative action in New York state court, claiming that Sentry's directors, management, and service providers breached duties to Sentry (the "derivative action").[1]

Back in the BVI, ten of Sentry's shareholders applied for the appointment of a liquidator. On July 21, 2009, the High Court of Justice of the Eastern Caribbean Supreme Court (the "BVI court") entered an order which commenced Sentry's liquidation proceedings under the Virgin Islands Insolvency Act of 2003. The order appointed Kenneth Krys and Christopher Stride (from the BVI liquidation firm of Krys and Associates) as liquidator,[2] and gave the liquidator "custody and control of all the assets of the Company."

On June 14, 2010, pursuant to an order of the BVI court, the liquidator petitioned the United States

_____

[1] Later that month, Sentry would file a direct lawsuit in New York state court against its investment manager, FGG, and FGG's affiliates.

[2] Stride later resigned and was replaced by Joanna Lau, who herself then resigned. Krys is currently Sentry's sole liquidator and the appellee in this case (hereafter referred to as the "liquidator").

Bankruptcy Court in the Southern District of New York (Lifland, J.) for recognition of the BVI liquidation proceedings under Chapter 15 of the Bankruptcy Code (the "Chapter 15 petition").[3]

As of that date, Sentry's liquid assets consisted of approximately $73 million in Ireland, $22 million in the United Kingdom, and $17 million in the BVI. Its other assets were claims and causes of action, including claims for approximately: $6 billion in customer funds under the Securities Investor Protection Act; $3 billion from Madoff customers who profited from redemptions in New York; and $150 million in similar redemption claims in the BVI. Other proceedings were commenced in the Netherlands and Ireland. The litigations were undertaken under the supervision of the BVI court and with the assistance of the liquidator's BVI-based counsel.

On July 22, 2010, the bankruptcy court granted the liquidator's Chapter 15 recognition petition. In determining Sentry's COMI for purposes of Chapter 15, the bankruptcy court examined the period between December 2008,

---

[3] Recognition of a foreign proceeding under Chapter 15 can have the effect of staying all other actions against the debtor in the United States, as explained in Part I below.

7

when Sentry stopped doing business, and June 2010, when the Chapter 15 petition was filed. The bankruptcy court determined that Sentry's "COMI for the purpose of recognition as a main proceeding is in the BVI, and not elsewhere," and therefore recognized the BVI liquidation as a "foreign main proceeding" under 11 U.S.C. § 1517(b)(1). Modified Bench Mem. & Order Granting Chapter 15 Petitions of Fairfield Sentry Ltd., Fairfield Sigma Ltd. & Fairfield Lambda Ltd. for Recognition of Foreign Proceedings, In re Fairfield Sentry Ltd., No. 10-13164(BRL), at 6 (Bankr. S.D.N.Y. July 30, 2010) (hereinafter "Bankr. Order").

Pursuant to 11 U.S.C. § 1520, recognition of the BVI liquidation as a foreign main proceeding imposed an automatic stay on any other proceedings against Sentry in the United States--including the derivative action brought by Morning Mist. Id. at 9 (recognizing automatic stay); see also 11 U.S.C. § 1520(a)(1) (imposing automatic stay from 11 U.S.C. § 362). The bankruptcy court concluded in the alternative that even if the BVI liquidation was a "nonmain" proceeding (in which a stay would not be automatic), a stay of the derivative action was appropriate under 11 U.S.C. § 1521, which allows for such relief. Bankr. Order at 9-11.

Morning Mist appealed the bankruptcy court's order to the district court.  On September 16, 2011, the United States District Court for the Southern District of New York (Daniels, J.) affirmed, holding that the bankruptcy court properly considered Sentry's administrative activities in its COMI analysis, and correctly considered Sentry's COMI as of the filing of the Chapter 15 petition (not over its 18 year operational history).  Mem. Decision & Order, In re Fairfield Sentry Ltd., No. 10 Civ. 7311(GBD), at 7-12 (S.D.N.Y. Sept. 16, 2011).  Morning Mist had argued there (as it argues here) that recognition of the BVI liquidation would be manifestly contrary to U.S. public policy, and was therefore barred by 11 U.S.C. § 1506, because the court records in the BVI liquidation were sealed.  The argument was rejected on the ground that the right of public access to court records is not absolute.  Id. at 14-17.

Imposition of the automatic stay was affirmed, including the stay of Morning Mist's derivative action against Sentry.  Id. at 18.  Morning Mist timely appealed.

**DISCUSSION**

We review an appeal from a district court's affirmance of a bankruptcy court decision "independently," accepting the bankruptcy court's factual findings unless clearly erroneous, and reviewing the bankruptcy court's legal conclusions de novo. In re Enron Corp., 419 F.3d 115, 124 (2d Cir. 2005) (quoting In re AroChem Corp., 176 F.3d 610, 620 (2d Cir. 1999)).

**I**

Chapter 15 of the Bankruptcy Code was enacted in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (codified at 11 U.S.C. §§ 1501-1532). Its goal "is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency," while promoting international cooperation, legal certainty, fair and efficient administration of cross-border insolvencies, protection and maximization of debtors' assets, and the rescue of financially troubled businesses. 11 U.S.C. § 1501(a).

Chapter 15 is derived from the Model Law promulgated by the United Nations Commission on International Trade Law ("UNCITRAL"), and it instructs that "[i]n interpreting [Chapter 15], the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. The legislative history accompanying the passage of Chapter 15 recommends the Guide to Enactment of the Model Law, promulgated by UNCITRAL, "for guidance as to the meaning and purpose of [the Model Law's] provisions." H.R. Rep. No. 109-31, pt. 1, at 106 n.101 (2005) (hereinafter "House Report").[3]

The recognition of foreign proceedings is governed by Sections 1515 through 1524. Under Section 1517, "an order recognizing a foreign proceeding shall be entered if--(1) such foreign proceeding . . . is a foreign main proceeding or foreign nonmain proceeding within the meaning of section

---

[3] See also id. at 109-10 ("Uniform interpretation will also be aided by reference to CLOUT, the UNCITRAL Case Law On Uniform Texts . . . . Not only are these sources persuasive, but they advance the crucial goal of uniformity of interpretation. To the extent that the United States courts rely on these sources, their decisions will more likely be regarded as persuasive elsewhere.").

1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a). There is no dispute that the second and third requirements are met here. The only point at issue is whether the BVI liquidation qualifies as a foreign main or nonmain proceeding.

Section 1502 defines a foreign main proceeding as a "foreign proceeding pending in the country where the debtor has the center of its main interests," and defines a foreign nonmain proceeding as a "foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment."[4] 11 U.S.C. § 1502(4)-(5). The statute does not define COMI. It does, however, establish a presumption: "In the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c).

Upon recognition of a foreign main proceeding, Section 1520 provides certain automatic, nondiscretionary relief,

---

[4] "Establishment" is defined as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2).

12

including an automatic stay of all proceedings against the debtor in the United States.  11 U.S.C. § 1520(a).  A discretionary stay is also available under Section 1521, regardless of whether a foreign main proceeding is recognized.  11 U.S.C. § 1521(a).

Finally, Section 1506 provides an overriding public policy exception to all of Chapter 15: "Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.

## II

Few courts have considered the meaning of COMI under Chapter 15, especially with respect to the time frame and the factors that bear on the question.[5]

**A.   Relevant Time Period**

Morning Mist argues that the bankruptcy court should

---

[5]   We have only mentioned Chapter 15 in cases where Section 304 of the Bankruptcy Code, the predecessor provision to Chapter 15, applied.  See, e.g., In re Bd. of Dirs. of Telecom Arg., S.A., 528 F.3d 162, 169 (2d Cir. 2008) (noting that Section 304 controls because the bankruptcy petition was filed prior to Chapter 15's effective date).

have looked at Sentry's entire operational history, while the liquidator advocates affirmance of the determinations that COMI should be considered as of the filing of the Chapter 15 petition.  To identify the time frame relevant to the COMI determination, we consider: (1) the text of the statute; (2) guidance from other federal courts; and (3) international sources.  We conclude that a debtor's COMI is determined as of the time of the filing of the Chapter 15 petition.  To offset a debtor's ability to manipulate its COMI, a court may also look at the time period between the initiation of the foreign liquidation proceeding and the filing of the Chapter 15 petition.

Statutory Text.  Chapter 15 does not define COMI. Section 1517 provides that a "foreign proceeding shall be recognized . . . as a foreign main proceeding if it *is pending* in the country where the debtor *has* the center of its main interests."  11 U.S.C. § 1517(b) (emphases added).

The present tense suggests that a court should examine a debtor's COMI at the time the Chapter 15 petition is filed.  "Consistent with normal usage, we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach."  Carr v. United States, 130 S.

14

Ct. 2229, 2236 (2010); see also Dobrova v. Holder, 607 F.3d 297, 301 (2d Cir. 2010) (relying on Congress's use of present perfect tense in statutory construction). In In re AroChem Corp., we were guided by the tense used in a provision of the Bankruptcy Code allowing bankruptcy trustees to hire professionals (e.g., lawyers, accountants), as long as the professionals "'*do not hold or represent* an interest adverse to the estate.'" In re AroChem Corp., 176 F.3d 610, 623 (2d Cir. 1999) (quoting 11 U.S.C. § 327(a)) (emphasis added). The present tense signified that an estate's counsel would not be disqualified based on past or future representations. Id.

It therefore matters that the inquiry under Section 1517 is whether a foreign proceeding "*is pending* in the country where the debtor *has* the center of its main interests." 11 U.S.C. § 1517(b)(1) (emphases added). In this light, we reject Morning Mist's invitation for us to consider the debtor's entire operational history. Likewise, a COMI determination based on the date of the *initiation* of the foreign proceeding is not compelled by the statute. A foreign proceeding "*is pending*," 11 U.S.C. § 1517(b)(1) (emphasis added), only after it has been commenced. Under

15

the text of the statute, therefore, the filing date of the Chapter 15 petition should serve to anchor the COMI analysis.

Other Federal Courts. Nearly every federal court to address this question has determined that COMI should be considered as of the time the Chapter 15 petition is filed.

Among circuit courts, only the Fifth has specifically decided the question. The argument that the COMI determination should be made with regard to the debtor's operational history was rejected in In re Ran:

> Every operative verb is written in the present or present progressive tense. . . . Congress's choice to use the present tense requires courts to view the COMI determination in the present, i.e. at the time the petition for recognition was filed. If Congress had, in fact, intended bankruptcy courts to view the COMI determination through a look-back period or on a specific past date, it could have easily said so.

In re Ran, 607 F.3d 1017, 1025 (5th Cir. 2010). The court highlighted a provision in the Bankruptcy Code that explicitly includes a look-back period (11 U.S.C. § 522(b)(3)(A)), as was not done in Chapter 15. Id.

The Fifth Circuit observed that its approach would advance Congress's purpose of harmonizing transnational insolvency proceedings because looking at a company's full operational history could make it more difficult to pinpoint

16

a single COMI: "In fact, a meandering and never-ending inquiry into the debtor's past interests could lead to a denial of recognition in a country where a debtor's interests are truly centered, merely because he conducted past activities in a country at some point well before the petition for recognition was sought."  Id.

For similar reasons, the Fifth Circuit emphasized that third parties (primarily creditors) should be able to ascertain a debtor's COMI.  Id. at 1025-26.  We agree.[6]

The Fifth Circuit left open the possibility (albeit in dicta) of looking at a broader time frame in order to frustrate possible bad-faith COMI manipulation:

> Lastly, we note that this case does not involve a recent change of domicile by the [debtor] in question. A similar case brought immediately after the party's arrival in the United States following a long period of domicile in the country where the bankruptcy is pending would likely lead to a different result.

Id. at 1026.

Most courts in this Circuit and throughout the country appear to have examined a debtor's COMI as of the time of

---

[6]  The Fifth Circuit pointed to English cases "which seem to select a time linked to the *commencement or service of the relevant insolvency proceeding*."  Id. at 1026 (emphasis added).  But the italicized phrase is (at least) ambiguous, a matter not resolved by the Fifth Circuit.  We consider international law on this point in the following section.

17

the Chapter 15 petition.  See, e.g., In re Fairfield Sentry Ltd., No. 10 Civ. 7311(GBD), 2011 WL 4357421, at *6 (S.D.N.Y. Sept. 16, 2011); In re British Am. Isle of Venice (BVI), Ltd., 441 B.R. 713, 720-21 (Bankr. S.D. Fla. 2010); In re British Am. Ins. Co., 425 B.R. 884, 909-10 (Bankr. S.D. Fla. 2010); In re Betcorp Ltd., 400 B.R. 266, 290-92 (Bankr. D. Nev. 2009).  But there have certainly been courts that have taken a different approach.  See, e.g., In re Millennium Global Emerging Credit Master Fund Ltd., 474 B.R. 88, 92 (S.D.N.Y. 2012) (recognizing bankruptcy court's conclusion that "COMI should be determined as of the date of the commencement of the foreign proceeding, rather than--as most of the courts that have looked at the issue have concluded--the date on which the Chapter 15 petition was filed").

Morning Mist, taking a cue from a prominent bankruptcy court decision, suggests that we should employ the American jurisdictional concept of "principal place of business" when considering COMI, which would thus require consideration of a debtor's operational history.  Appellants' Br. 33 (citing In re Millennium Global Emerging Credit Master Fund Ltd., 458 B.R. 63, 72 (Bankr. S.D.N.Y. 2011)).  In In re

18

Millennium Global, the bankruptcy court suggested substituting principal place of business for COMI, in which case "it is obvious that the date for determining an entity's place of business refers to the business of the entity before it was placed into liquidation."  458 B.R. at 72.  In support, the bankruptcy court quoted a law review article by one of the drafters of Chapter 15.  Id.  The quoted text, however, supports the contrary view: Congress's decision to use the term "COMI" instead of "principal place of business" was intentional:

> Chapter 15 was drafted to follow the Model Law as closely as possible, with the idea of encouraging other countries to do the same.  One example is use of the phrase "center of main interests," which could have been replaced by "principal place of business" as a phrase more familiar to American judges and lawyers.  The drafters of Chapter 15 believed, however, that such a crucial jurisdictional test should be uniform around the world and hoped that its adoption by the United States would encourage other countries to use it as well.

Jay Lawrence Westbrook, *Chapter 15 At Last*, 79 Am. Bankr. L.J. 713, 719-20 (2005).

As further support for the analogy to principal place of business, the bankruptcy court in In re Millennium Global pointed to Chapter 15's predecessor, Section 304 of the Bankruptcy Code.  458 B.R. at 73.  Section 304, now

repeated, allowed a party to commence a proceeding in U.S. bankruptcy court "ancillary" to a "foreign proceeding" and defined "foreign proceeding" as a proceeding "in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding." 11 U.S.C. § 101(23) (2000). That wording looks to a debtor's principal place of business at the time of the commencement of the foreign liquidation proceeding. But while the concept may be useful in adducing factors that point to a COMI, Congress abandoned that provision in enacting Chapter 15.

International Interpretations. Congress instructed that "[i]n interpreting [Chapter 15], the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. Legislative history points to the Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency (the "UNCITRAL Guide") "for guidance as to the meaning and purpose of [Chapter 15's] provisions." House Report at 106 n.101. Although the statutory text controls, first and ultimately, we consider

20

international sources to the extent they help us carry out the congressional purpose of achieving international uniformity in cross-border insolvency proceedings.

The UNCITRAL Guide, which does not define COMI, indicates that the concept was drawn from the European Union Convention on Insolvency Proceedings.  <u>See</u> UNCITRAL Guide ¶¶ 31, 72.  In turn, the European Union Council Regulation enacting the Convention on Insolvency Proceedings provides some guidance: "The 'centre of main interests' should correspond to the place where the debtor *conducts the administration of his interests on a regular basis* and *is therefore ascertainable by third parties*."  Council Regulation (EC) No 1346/2000 of 29 May 2000, Preamble ¶ 13 (emphases added) (hereinafter "EU Regulation").  Like the U.S. statute, the EU Regulation employs the present tense. The focus on regularity and ascertainability should also inform our interpretation of the text.  The reference to the debtor's administration "on a regular basis," however, could suggest a potentially broader time frame.

But the EU Regulation does not operate as an analog to Chapter 15.  Under the EU Regulation, a main insolvency proceeding in one EU member state is automatically

21

recognized by all other EU member states. See EU Regulation art. 16. So the EU has no need for a recognition petition such as provided under Chapter 15. (Because the United States and the BVI are not parties to an agreement on the subject and are not otherwise governed by a common legal framework, a debtor must file a Chapter 15 petition in the United States for the BVI proceeding to be recognized).[7] Although the EU Regulation might refer to a broader time frame for considering a debtor's COMI, it is not a fit for construing Chapter 15.

Relevant European case law interpreting COMI appears to generally focus on whether a debtor's COMI is regular and ascertainable, as suggested by the EU Regulation. For example, in In re Eurofood IFSC Ltd., the Court of Justice of the European Union focused on "criteria that are both objective and ascertainable by third parties" to determine a

---

[7] In In re Millennium Global, the bankruptcy court observed that "[t]he EU Regulation does not contemplate the commencement of a separate ancillary proceeding to seek recognition of a foreign insolvency case, as in the Model Law and chapter 15, as the members of the Union are automatically required to recognize foreign proceedings from the date of their opening." 458 B.R. at 74. But that conclusion does not persuade us that we should determine COMI under Chapter 15 based on the date of commencement of the foreign proceeding as the bankruptcy court held in that case; rather, it suggests that the EU Regulation may be a poor analog for interpreting Chapter 15.

debtor's COMI. In re Eurofood IFSC Ltd., Case C-341/04, 2006 E.C.R. I-3813, 2006 WL 1142304, ¶ 33 (E.C.J. 2006). Likewise, in In re Stanford International Bank Ltd., the England and Wales Court of Appeal (Civil Division) looked to whether third parties could ascertain a debtor's COMI, specifically by examining factors "in the public domain." In re Stanford Int'l Bank Ltd., Case No. A3/2009/1565 & 1643, 2010 EWCA Civ 137, 2010 WL 605796, ¶¶ 54-56 (Ct. of Appeal 2010). These interpretations also reflect a concern about possible COMI manipulation. See, e.g., In re Eurofood IFSC Ltd., 2006 WL 1142304, ¶ 35 (indicating concern with a "'letterbox' company not carrying out any business in the territory of the Member State in which its registered office is situated"). A COMI that is regular and ascertainable is not easily subject to tactical removal.

Overall, international sources are of limited use in resolving whether U.S. courts should determine COMI at the time of the Chapter 15 petition or in some other way.

\* \* \*

We therefore hold that a debtor's COMI should be determined based on its activities at or around the time the

23

Chapter 15 petition is filed, as the statutory text suggests. But given the EU Regulation and other international interpretations, which focus on the regularity and ascertainability of a debtor's COMI, a court may consider the period between the commencement of the foreign insolvency proceeding and the filing of the Chapter 15 petition to ensure that a debtor has not manipulated its COMI in bad faith.

**B.    COMI Factors**

The parties also dispute what factors are relevant for locating a COMI. Morning Mist argues that Sentry's liquidation activities are irrelevant to the COMI determination; the liquidator responds that these activities and the fact of the BVI proceedings are the kind of objective criteria that can be ascertained by third parties, and are therefore critical. We hold that any relevant activities, including liquidation activities and administrative functions, may be considered in the COMI analysis.

Chapter 15 creates a rebuttable presumption that the country where a debtor has its registered office will be its

COMI: "In the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). But federal courts have focused on a variety of other factors as well. The United States Bankruptcy Court for the Southern District of New York has developed a widely adopted list of COMI factors--warning, however, against mechanical application:

> Various factors, singly or combined, could be relevant to such a determination: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

In re SPhinX, Ltd., 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006). This nonexclusive list is a helpful guide, but consideration of these specific factors is neither required nor dispositive.

The SPhinX court and other federal courts have also turned to international law, as directed by Congress. See, e.g., In re SPhinX, Ltd., 351 B.R. at 118; In re Tri-Continental Exch. Ltd., 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006). As discussed in Part II.A above, the EU

25

Regulation enacting the European Union Convention on Insolvency explains that COMI "should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties."  EU Regulation, Preamble ¶ 13.  While this guidance may have been of limited utility in resolving the timing question discussed in Part II.A, it underscores the importance of factors that indicate regularity and ascertainability.[8]

The absence of a statutory definition for a term that is not self-defining signifies that the text is open-ended, and invites development by courts, depending on facts presented, without prescription or limitation.

**III**

---

[8]  As mentioned above, the bankruptcy court in In re Millennium Global employed the concept of "principal place of business" to guide its COMI analysis.  Accordingly, it applied the Supreme Court's recent definition of that concept, which looks at a corporation's "nerve center," i.e., "where a corporation's officers direct, control, and coordinate the corporation's activities."  Hertz Corp. v. Friend, 130 S. Ct. 1181, 1192 (2010).  Given Congress's choice to use COMI instead of "principal place of business," that concept does not control the analysis.  But to the extent that the concepts are similar, a court may certainly consider a debtor's "nerve center," including from where the debtor's activities are directed and controlled, in determining a debtor's COMI.

26

Applying the principles set out above, we affirm the decision of the district court (which affirmed the bankruptcy court) recognizing the BVI liquidation as a foreign main proceeding.

In a nutshell: for a proceeding to be recognized as a "foreign main proceeding," it must be "pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1517(b)(1). That determination is based on a debtor's COMI at the time the Chapter 15 petition is filed. A court may look at the period between the commencement of the foreign proceeding and the filing of the Chapter 15 petition to ensure that a debtor has not manipulated its COMI in bad faith, but there is no support for Morning Mist's contention that a debtor's entire operational history should be considered. The factors that a court may consider in this analysis are not limited and may include the debtor's liquidation activities.

The bankruptcy court made factual findings that place Sentry's COMI in the BVI during the relevant time period:

> Upon the revelation of the notorious Madoff fraud in December of 2008, the Debtors discontinued the transfer of funds for investment with BLMIS in New York, which comprised 95% of Sentry's investments. The board of representatives at the Debtors' New York-based

27

investment managers, [FGG], resigned shortly thereafter, and the Debtors' contracts with FGG were severed in 2009, still long before the filing of the Petition. As a result, the Debtors have no place of business, no management, and no tangible assets located in the United States. Rather, the Debtors' activities for an extended period of time have been conducted only in connection with winding up the Debtors' business. . . . The Court finds that the facts now extant provide a sufficient basis for finding that the Debtors' COMI for the purpose of recognition as a main proceeding is in the BVI, and not elsewhere.

Bankr. Order at 5-6. The court went on to find that, even though Sentry had assets in other jurisdictions, the administration of its affairs in the relevant time was orchestrated from the BVI. Id. at 6. There was no finding of bad-faith COMI manipulation: "the record here as to the relevant time period beginning December 2008, which straddles the Liquidators' appointment dates, does not support a finding of an opportunistic shift of the Debtors' COMI or any biased activity or motivation to distort factors to establish a COMI in the BVI." Id. at 8.

The bankruptcy court's factual findings are not clearly erroneous and support the conclusion that Sentry's COMI was in the BVI at the time of the Chapter 15 petition, and that Sentry did not manipulate its COMI in bad faith between the initiation of the BVI proceeding and the filing of the Chapter 15 petition. True, the relevant time period was

28

when the Chapter 15 petition was filed (with a look backward to thwart manipulation), whereas the bankruptcy court looked at a longer period (beginning with Madoff's arrest), but the difference is not material.  We therefore affirm.[9]

**IV**

Finally, Morning Mist argues that the bankruptcy court should have applied the public policy exception available under 11 U.S.C. § 1506, because the BVI proceedings, which are in the main confidential, were "cloaked in secrecy." Appellants' Br. 25.

Section 1506 provides: "Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  This Court has not had occasion to discuss the application of Section 1506.

The statutory wording requires a narrow reading.

---

[9] Morning Mist also claims that the bankruptcy court erroneously stayed the derivative action that it brought against Sentry.  Appellants' Br. 36-37.  Because we affirm the recognition of the BVI liquidation as a foreign main proceeding, the stay was automatic.  See 11 U.S.C. § 1520(a) (imposing automatic stay on U.S. proceedings against debtor upon recognition of foreign main proceeding).

29

Section 1506 does not create an exception for *any* action under Chapter 15 that may conflict with public policy, but only an action that is "*manifestly* contrary." 11 U.S.C. § 1506 (emphasis added). The legislative history confirms:

> [Section 1506] follows the Model Law article 5 exactly, is standard in UNCITRAL texts, and has been *narrowly interpreted on a consistent basis in courts around the world*. The word "manifestly" in international usage restricts the public policy exception to *the most fundamental policies of the United States*.

House Report at 109 (emphases added). The UNCITRAL Guide further explains that the exception should be read "restrictively" and invoked only "under exceptional circumstances concerning matters of fundamental importance for the enacting State." UNCITRAL Guide ¶ 89. Federal courts in the United States have adopted this view. See, e.g., In re Vitro S.A.B. de CV, 701 F.3d 1031, 1069-70 (5th Cir. 2012); In re Iida, 377 B.R. 243, 259 (B.A.P. 9th Cir. 2007); In re Ephedra Prods. Liab. Litig., 349 B.R. 333, 336 (S.D.N.Y. 2006); In re Toft, 453 B.R. 186, 193 (Bankr. S.D.N.Y. 2011); In re Metcalfe & Mansfield Alt. Invs., 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010).[10]

_____

[10] Even beyond the bankruptcy context, we apply public policy exceptions sparingly. For example, in the judgment enforcement context, a foreign judgment "is unenforceable as against public policy to the extent that it is repugnant to fundamental notions of what is decent and just in the State

The confidentiality of BVI bankruptcy proceedings does not offend U.S. public policy. Although the BVI liquidation has proceeded under seal, Morning Mist's assertion that they are "shrouded in secrecy" is overwrought. Appellants' Br. 7. The BVI court did seal the various applications and orders in the liquidation, but public summaries have been made available. <u>See, e.g.</u>, J.A. 445-46 (summarizing applications and orders before BVI court). Such restricted access to court documents is not unusual in the BVI, as the liquidator explains, because only certain limited records are typically available to non-parties. Appellees' Br. 12-13. And in all cases in the BVI, including this liquidation, any non-party may apply to the court for access to sealed documents. <u>Id.</u>

In any event, Morning Mist cannot establish that unfettered public access to court records is so fundamental in the United States that recognition of the BVI liquidation constitutes one of those exceptional circumstances contemplated in Section 1506. "[T]he right to inspect and copy judicial records is not absolute." <u>Nixon v. Warner</u>

where enforcement is sought," but that "standard is high, and infrequently met." <u>Ackermann v. Levine</u>, 788 F.2d 830, 841 (2d Cir. 1986) (internal quotation marks omitted).

Commc'ns, Inc., 435 U.S. 589, 598 (1978).  In Lugosch v. Pyramid Co. of Onondaga, we discussed at length the common law and constitutional rights to public access of court documents.  Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119-20 (2d Cir. 2006).  The right to access court documents is not absolute and can easily give way to "privacy interests" or other considerations.  Id. at 120; see also United States v. Amodeo, 44 F.3d 141, 146 (2d Cir. 1995) ("Although there is a presumption favoring access to judicial records, the fact that a document is a judicial record does not mean that access to it cannot be restricted." (internal citation omitted)).

Important as public access to court documents may be, it is not an exceptional and fundamental value.  It is a qualified right; and many proceedings move forward in U.S. courtrooms with some documents filed under seal, including many cases in this Court.  There is no basis on which to hold that recognition of the BVI liquidation is manifestly contrary to U.S. public policy.

**CONCLUSION**

For the foregoing reasons, we affirm.

32