

**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>BLACK GOLD S.A.R.L.,<br>　　　　　　Debtor.<br>JEAN-PAUL SAMBA, Foreign<br>Representative of Debtor,<br>　　　　　　Appellant,<br>v.<br>INTERNATIONAL PETROLEUM<br>PRODUCTS AND ADDITIVES<br>COMPANY, INC.,<br>　　　　　　Appellee. | BAP No.  NC-21-1068-BGT<br><br>Bk. No.  20-41815<br><br><br>**OPINION** |

Appeal from the United States Bankruptcy Court
for the Northern District of California
Roger L. Efremsky, Bankruptcy Judge, Presiding

APPEARANCES:
James R. Irving of Dentons Bingham Greenebaum LLP argued for appellant;
Vinay Vijay Joshi of Amin Turocy & Watson LLP argued for appellee.

Before: BRAND, GAN, and TAYLOR, Bankruptcy Judges.

BRAND, Bankruptcy Judge:

## INTRODUCTION

Jean-Paul Samba, Foreign Representative of debtor Black Gold S.A.R.L.

("Black Gold"), appeals an order denying his petition for recognition of a foreign

1

proceeding under chapter 15.[1] Previously, Black Gold had filed an insolvency proceeding in Monaco ("Monegasque Proceeding"). Mr. Samba is the appointed trustee. Black Gold's primary creditor, International Petroleum Products and Additives Company, Inc. ("IPAC"), maintained that the Monegasque Proceeding was a "sham" proceeding and that the chapter 15 filing in the United States was just an act in furtherance of the sham.

The bankruptcy court ruled that, based on the misconduct and bad faith of Black Gold, its insiders, Mr. Samba, and their attorneys, the case did not serve the purposes and objectives of § 1501, and it denied recognition of the Monegasque Proceeding on that basis. This was error.

Section 1501 did not provide the court with the discretion to deny recognition of a foreign proceeding. Rather, that determination had to be made under § 1517(a). If the requirements under that statute were satisfied, the court could only deny recognition if it found that doing so would be manifestly contrary to U.S. public policy. § 1506. The court did not make any findings under § 1517(a), and it declined to find that the Monegasque Proceeding violated the public policy provision of § 1506.

The facts in this case are undisputed. We conclude that the requirements for recognition under § 1517(a) were satisfied, and that recognition of the Monegasque Proceeding would not be manifestly contrary to U.S. public policy, whether we consider Monegasque insolvency law generally or the individual

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

misconduct or bad faith alleged here. Thus, recognition should have been granted. Accordingly, we REVERSE.

## FACTS

### A.    Background of the parties and IPAC's judgment

Black Gold is a Monaco limited liability company. Its sole shareholders are Lorenzo Napoleoni and his wife, Sofia, Italian citizens who reside in Monaco. Mr. Napoleoni is Black Gold's manager and CEO. Black Gold has no other employees, officers, or directors. Until June 2020, Black Gold operated as a trading company and distributor offering oil and lubricant products in Europe, Africa, and Asia. IPAC is a California-based petroleum additive manufacturing and sales company. IPAC is Black Gold's largest creditor; more than 96% of Black Gold's debt is owed to IPAC.

In 2016, Black Gold agreed to be a sales representative and exclusive distributor of IPAC products in Europe. Black Gold had access to sensitive and confidential IPAC information, including IPAC's customer list, the quantity and pricing of IPAC products, and trade secrets for IPAC's products. Black Gold agreed to maintain the confidentiality of IPAC's information and to not provide service or assistance for competing products. Despite the confidentiality agreement, and unbeknownst to IPAC, Mr. Napoleoni and a former IPAC employee established a competing additives business, PXL.

When IPAC discovered PXL's existence and the theft of its trade secrets and customer list, it initiated an arbitration proceeding against Black Gold in California. On May 29, 2019, the arbitrator issued a Final Award to IPAC for

3

$1,094,193.58, finding that Black Gold, through Mr. Napoleoni, stole IPAC's trade secrets to formulate, make, market and sell PXL products. Over Black Gold's objection, the California district court confirmed the Final Award and entered Judgment.

IPAC took actions in Monaco and the United States to collect the debt, but those efforts have not borne fruit, and the commencement of the Monegasque Proceeding halted IPAC's collection efforts in Monaco. IPAC has filed a claim in the Monegasque Proceeding, but the outcome appears grim. In California, IPAC pursued a judgment debtor examination of Black Gold, seeking to examine the Napoleonis about the disposition of Black Gold's assets, which IPAC claimed the Napoleonis transferred to themselves to defraud IPAC. The chapter 15 filing prevented the examination from going forward.

## B. The Monaco insolvency proceeding and Monegasque law

In May 2020, Black Gold filed an insolvency proceeding in Monaco. The Monegasque court then entered a judgment commencing the Monegasque Proceeding. It fixed May 29, 2019, as the date of Black Gold's "cessation of payments" (or insolvency date) and appointed Mr. Samba as trustee. Mr. Samba has been a trustee in insolvency proceedings in Monaco since 1983.

The following is an overview of Monaco's insolvency laws, which have been codified in articles 408 to 611 of the Monegasque Commercial Code.[2] Upon entry of the insolvency judgment and commencement of the insolvency proceeding, the Monegasque court fixes the date of the debtor's cessation of

---

[2] The Monegasque Commercial Code can be found at: https://www.legimonaco.mc/305//legismc.nsf/Home (last visited on Feb. 17, 2022).

payments, which may be no earlier than three years prior to the date of the judgment but may be later modified on request. *Id.* arts. 414, 455. The fixed date is significant, as it allows the trustee to avoid and recover certain improper transfers or payments made by the debtor after that date. *Id.* arts. 456, 457. The court appoints a judge specializing in insolvency matters and a trustee. *Id.* art. 414. The trustee is responsible for administering the case, assisting or representing the debtor, and acting on behalf of creditors. *Id.* art. 421. The judge is responsible for monitoring the process and oversees the trustee. *Id.* art. 417. The judge can rule on disputed issues and convene a meeting of creditors to ascertain their position on an issue. *Id.*

Throughout the proceeding, the trustee has various reporting duties. Initially, the trustee must prepare a report regarding the debtor's finances. *Id.* art. 438. The trustee later submits a statement of claims against the debtor (discussed below). *Id.* art. 468. Any transaction or act proposed to be performed by the trustee may be deferred to the judge, with the judge also able to intervene sua sponte. *Id.* art. 425. If the judge believes it to be appropriate, he or she can replace or remove a trustee. *Id.* art. 424.

Upon entry of the insolvency judgment, the debtor retains its interests in its property, but essentially cannot act with respect to such property without first obtaining the trustee's consent. Any act by the debtor as to its property without consent is not enforceable. *Id.* art. 441. Additionally, any actions or proceedings as to the debtor's property, whether being prosecuted or defended by the debtor, may only be pursued by the trustee. *Id.* The debtor is obligated to assist the trustee with respect to any acts concerning the administration and

disposition of the debtor's property. *Id.* If the debtor does not perform an act necessary to protect its property, the trustee can do so with authorization from the judge. *Id.* art. 442.

Entry of the insolvency judgment suspends any actions by creditors to enforce or collect a debt against or from the debtor. *Id.* art. 461. Creditors must submit claims to the trustee, which the trustee verifies. *Id.* arts. 462, 466, 467. Following verification, the trustee prepares a statement indicating whether the claim is admitted or disputed. *Id.* art. 468. The judge then issues a decision confirming or denying the trustee's position on each claim. *Id.* The debtor and creditors have the right to object to the trustee's statement of claims before the court. *Id.* arts. 470-472. Absent some exception, if a creditor does not submit a claim, the creditor is excluded from the insolvency proceeding and not entitled to receive any distributions made. *Id.* art. 464.

Once the trustee's statement of claims becomes final and all objections are adjudicated, the court determines whether the insolvency proceeding will proceed with a settlement (reorganization) or a liquidation. *Id.* arts. 493, 494. If a settlement is ordered, the debtor proposes a debt restructuring settlement with its creditors. *Id.* arts. 494, 497, 498. If a liquidation is ordered, the debtor is divested of all rights in its property and the trustee is authorized to liquidate the property, without the need to consult or obtain the debtor's consent. *Id.* arts. 494, 495, 530. Sales of the debtor's property are usually by public auction, but the trustee may, with judicial authorization, sell property by private sale. *Id.* art. 535.

Creditors are ranked according to their claims' priority rights. *Id.* art. 533. The trustee then makes distributions in accordance with the priority scheme established under Monegasque law. *Id.* arts. 540-542. Secured and preferential creditors who are not paid in full are considered unsecured creditors for the outstanding balance of their claims. *Id.* art. 539. A liquidation proceeding is closed once the claims are paid. *Id.* art. 547. If due to lack of assets administration cannot continue any further, the court can suspend the liquidation proceeding. *Id.* art. 544.

## C.    The chapter 15 filing and motion for recognition

In November 2020, Mr. Samba as Foreign Representative filed a chapter 15 petition and motion for recognition on behalf of Black Gold in the California bankruptcy court. He argued that recognition of the Monegasque Proceeding was proper under § 1517(a) because: (i) Black Gold was an eligible debtor under § 109(a);[3] (ii) the Monegasque Proceeding was a "foreign proceeding" under

---

[3] Black Gold's only asset in the United States was a $10,000 security retainer paid prepetition to and held by Mr. Samba's attorneys – Dentons KY – in the firm's client-trust account in Kentucky. Mr. Samba argued that the retainer satisfied the debtor eligibility requirement in § 109(a), which provides that "only a person that resides or has a domicile, a place of business, or property in the United States or, a municipality, may be a debtor under this title." Chapter 1 applies to chapter 15 cases. *See* § 103(a).

The retainer issue was hotly contested. We GRANT IPAC's unopposed request to include an unredacted copy of the engagement letter in the record. The bankruptcy court ruled that chapter 15 debtors must satisfy § 109(a), and that the $10,000 security retainer, which the court found had not been drawn down prior to the chapter 15 filing, was "property in the United States." The parties do not dispute that § 109(a) applies to chapter 15 debtors, or that an undrawn security retainer held by the foreign representative's counsel satisfies the requirement that the debtor have "property in the United States." Therefore, we need not decide these issues. All IPAC disputes is whether the bankruptcy court erred in finding that the retainer had not been exhausted prior to the petition date. Given the record, we see no error in that finding.

§ 101(23), and as trustee he was qualified as a "foreign representative" under § 101(24); (iii) the Monegasque Proceeding was a "foreign main proceeding" under § 1502(4); (iv) the petition satisfied § 1515; and (v) recognition was not manifestly contrary to U.S. public policy under § 1506.

Mr. Samba represented that the Monegasque Proceeding was pending and that he was continuing to perform his duties as trustee. He further represented that the Monegasque court had not yet determined whether the Monegasque Proceeding would proceed as a settlement or as a liquidation. However, since Black Gold had ceased operations and had de minimis assets, a liquidation seemed likely.

Through several hearings and declarations from Mr. Samba and others, the bankruptcy court learned the following additional information about Monegasque insolvency law and the Monegasque Proceeding. As trustee, only Mr. Samba could speak for Black Gold and only he had access to information regarding Black Gold's assets and the status of the Monegasque Proceeding. Monaco trustees do not enjoy the plenary investigation powers available to trustees in the U.S., and they generally must rely on information provided by the debtor. Further, while creditors in Monaco have ways to seek information and documents, there is no equivalent to Rule 2004.

In addition, only Mr. Samba could control derivative claims or causes of action because they were property of Black Gold. There is no parallel in Monegasque law of "alter ego" liability, but Monegasque law does recognize legal theories which would make the company's manager liable for the company's debts if the company's assets were insufficient to pay them. Mr.

8

Samba said he had not yet decided whether to make such an argument, and that it was rare for a trustee in Monaco to do so. If such claims are not pursued, they are not automatically "abandoned" to creditors. Finally, the automatic stay does not terminate when the insolvency proceeding is closed.

IPAC argued that recognition of the Monegasque Proceeding would be manifestly contrary to U.S. public policy because Black Gold's insiders were acting in bad faith to exploit the bankruptcy systems in both Monaco and the United States. IPAC argued, neither the chapter 15 case nor the Monegasque Proceeding was initiated for the benefit of Black Gold, IPAC, or Mr. Samba. Rather, the true purpose of the proceedings was to allow the Napoleonis to escape liability for their intentional torts. Additionally, argued IPAC, the differences between the two proceedings were significant, and Monegasque insolvency law dramatically restricted the rights and remedies a creditor enjoys under U.S. law.

## D. The bankruptcy court's ruling on recognition

The bankruptcy court denied recognition of the Monegasque Proceeding. It was troubled by Mr. Samba's failure to appear at any of the hearings to address the court's noted concerns about the proceeding, and it was skeptical about the timing of the Monegasque court's "cessation of payments" date of May 29, 2019, which was coincidentally the date of the Final Award to IPAC.

The court was also concerned about the lack of candor from Mr. Samba's counsel regarding the details of the retainer agreement and who counsel represented. Only after multiple declarations and hearings did the court learn that Mr. Napoleoni was paying Mr. Samba's attorney's fees, Mr. Samba's

9

counsel also represented Black Gold in the California district court action, and a Dentons firm in Cincinnati was representing Mr. Napoleoni in litigation in Ohio. The court suggested that counsel hid these facts because it cast doubt on the integrity of the proceedings and Black Gold's good faith. As a result, the court found that Mr. Samba was not acting as a true fiduciary; this was a two-party dispute between Black Gold and its principals on one side and IPAC on the other. Any path for Mr. Samba to recover assets from Black Gold's principals for the benefit of creditors, under any theory, was "purely illusory."

In the end, the court determined that the petition was not a legitimate use of chapter 15 for the purposes and objectives as intended under § 1501, and it denied recognition on that basis. The court believed that the real purpose of the filing was to preclude IPAC from recovering on its Judgment and to protect the Napoleonis and PXL from their own wrongful conduct. Consequently, the court found that recognition of the Monegasque Proceeding would neither "promote fair and efficient administration of cross-border insolvencies" nor "protect the interests of all creditors."[4] Because the court found the filing to be improper under § 1501, it made no findings under § 1517. This timely appeal followed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(P). We have jurisdiction under 28 U.S.C. § 158.

---

[4] The bankruptcy court initially granted provisional relief under § 1519, staying any execution against Black Gold's assets in the U.S. and the judgment debtor examination. The court extended that relief until it denied recognition. The parties informed the Panel at oral argument that the judgment debtor examination has been completed.

**ISSUE**

Did the bankruptcy court err when it denied recognition of the Monegasque Proceeding under § 1501?

**STANDARD OF REVIEW**

We review the bankruptcy court's interpretation of the Code de novo. *Meruelo Maddux Props. – 760 S. Hill St., LLC v. Bank of Am., N.A. (In re Meruelo Maddux Props., Inc.)*, 667 F.3d 1072, 1076 (9th Cir. 2012).

**DISCUSSION**

**A.   The bankruptcy court erred by relying on § 1501 to deny recognition of the Monegasque Proceeding.**

Chapter 15 was added to the Code with the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, to "encourage cooperation between the United States and foreign countries with respect to transnational insolvency cases." H.R. Rep. No. 109-31(I) at 105 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 169. It replaced § 304, which originally provided the statutory framework for cases filed in the United States that are ancillary to insolvency proceedings filed in foreign countries. Chapter 15 incorporates into U.S. bankruptcy law the Model Law on Cross-Border Insolvency (the "Model Law"), promulgated in 1997 by the United Nations Commission on International Trade Law. Congress has specifically pointed to the Guide to Enactment of the Model Law (the "Guide") as providing historical and interpretive guidance to the meaning and purpose of the provisions in

11

chapter 15. *See* H.R. Rep. No. 109-31(I) at 106 n.101, *as reprinted in* 2005 U.S.C.C.A.N. at 169.[5]

Chapter 15, unlike other chapters in the Code, is unique in that it contains a statement of its purpose. Section 1501 combines the Model Law's Preamble with the Model Law's article 1. Section 1501(a) – the Model Law's Preamble – sets forth the purpose and five objectives of the chapter: (i) to encourage cooperation between courts of the United States and foreign courts in cross-border insolvency cases; (ii) to provide greater legal certainty for trade and investment; (iii) to promote the fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, the debtor, and other interested parties; (iv) to protect and maximize the debtor's assets; and (v) to facilitate the rescue of financially troubled businesses with the goal of protecting investment and preserving employment. § 1501(a)(1)-(5). Section 1501(b) – the Model Law's article 1 – identifies the four circumstances under which chapter 15 applies, including where assistance is sought in the United States by a foreign representative in connection with a foreign proceeding. *See* § 1501(b)(1).

The bankruptcy court relied exclusively on § 1501 to deny recognition of the Monegasque Proceeding. It did not cite, and we could not locate, another case where a court has applied § 1501 to determine recognition of a foreign proceeding. Mr. Samba argues that by relying on § 1501, the bankruptcy court

---

[5] The Model Law and Guide can be found at: https://uncitral.un.org/sites/uncitral.un.org/files/media-documents/uncitral/en/1997-model-law-insol-2013-guide-enactment-e.pdf (last visited on Feb. 17, 2022).

impermissibly engaged in a more discretionary analysis than what recognition under § 1517 authorizes. We agree.

Section 1501 does not control recognition of a foreign proceeding. Rather, recognition is governed by §§ 1515 through 1524. *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247 (2d Cir. 2013) (citing *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 132 (2d Cir. 2013)); *In re Millard*, 501 B.R. 644, 649 (Bankr. S.D.N.Y. 2013); *see also* Guide at ¶ 46 (the Preamble to the Model Law found in § 1501(a) is "not intended to create substantive rights" but rather to assist users of the Model Law in its interpretation). "Section 1501 confirms Congress' objectives of encouraging cooperation between the U.S. and foreign countries in order to protect the interests of debtors and creditors in international bankruptcy proceedings. But it is *section 1517* that sets the requirements for granting recognition of a foreign proceeding." *In re Millard*, 501 B.R. at 649 (emphasis in original) (footnote omitted).

The requirements for recognition of a foreign proceeding are outlined in § 1517(a), which provides that, subject to § 1506, an order **shall** be entered recognizing a foreign proceeding if: (1) the "foreign proceeding" is a "foreign main proceeding" or "foreign nonmain proceeding" within the meaning of § 1502; (2) the "foreign representative" applying for recognition is a person or body; and (3) the petition meets the requirements of § 1515. Section 1506, for purposes of § 1517(a), provides that the court may refuse to recognize a foreign proceeding if it would be manifestly contrary to the public policy of the United

States.[6] Thus, recognition is mandatory if all three requirements of § 1517(a) are met and there is no public policy basis to deny it. *In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 306-09 (3d Cir. 2013); *In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 870 (Bankr. S.D.N.Y. 2021); *In re Creative Fin. Ltd.*, 543 B.R. 498, 514 (Bankr. S.D.N.Y. 2016); *In re Millard*, 501 B.R. at 653-54. The foreign representative has the burden of proof on every element for recognition under § 1517(a). *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1021 (5th Cir. 2010) (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 334 (S.D.N.Y. 2008)); *In re Creative Fin. Ltd.*, 543 B.R. at 514.

Congress' use of the word "shall" in § 1517(a) removed the court's discretion in determining recognition if the requirements in the three subparagraphs of § 1517(a) have been satisfied. *In re Millard*, 501 B.R. at 653. Congress' intent to remove the court's discretion in determining recognition is also apparent from its enactment of § 1507 and the House Report discussion for § 1517. Former § 304(c) outlined several factors, including comity, which the court had to consider before granting a foreign representative any type of relief, including recognition. Those "discretionary" factors are now embodied in § 1507(b),[7] which applies only **after** recognition. Further, the House Report discussion for § 1517 states that "[t]he decision to grant recognition is **not**

---

[6] Precisely, § 1506 provides: "Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."

[7] Section 1507(b) provides:

In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

**dependent upon any findings about the nature of the foreign proceedings of the sort previously mandated by section 304(c)** of the Bankruptcy Code." H.R. Rep. No. 109-31(I) at 113, *as reprinted* in 2005 U.S.C.C.A.N. at 175 (emphasis added). *See also In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.N.D.Y. 2008) (citing Jay Lawrence Westbrook, *Locating the Eye of the Financial Storm*, 32 BROOK. J. INT'L L. 3, 6 (2007) ("The Model Law grants great discretion as to specific relief, but imposes a fairly rigid procedural structure for recognition of foreign proceedings.")). In short, the court must apply the requirements of § 1517(a), and if they are satisfied, recognition is mandatory. Here, the evidence established that the requirements were met.

A "foreign proceeding" is defined in § 101(23) as "a collective judicial or administrative proceeding in a foreign country . . . under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." The evidence established that the Monegasque Proceeding is a collective judicial proceeding in Monaco, conducted pursuant to Monegasque insolvency law, in which the assets of Black

---

(1) just treatment of all holders of claims against or interests in the debtor's property;
(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
(3) prevention of preferential or fraudulent dispositions of property of the debtor;
(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

Gold are subject to the foreign representative's control under the supervision of the Monegasque court for the purpose of reorganization or liquidation. It is undisputedly a foreign "main" proceeding.

Similarly, for purposes of § 1517(a)(2), a "foreign representative" is "a person or body . . . authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." § 101(24). Mr. Samba is a foreign representative. He has been appointed as trustee in the Monegasque Proceeding and is authorized to administer the reorganization or liquidation of Black Gold's assets or affairs. And there is no dispute that the petition satisfied the procedural requirements of § 1515.

Therefore, because the Monegasque Proceeding met the requirements of § 1517(a), recognition was mandatory. That is, unless recognition violated the public policy provision of § 1506.

**B.    The Monegasque Proceeding is not manifestly contrary to the public policy of the United States.**

The bankruptcy court declined to find that recognition of the Monegasque Proceeding would be manifestly contrary to U.S. public policy under § 1506 and instead erroneously found under § 1501 that recognition would be "manifestly unfair." Because the facts are undisputed and the issue of whether recognition of the Monegasque Proceeding would be manifestly contrary to U.S. public policy is a question of law, we can resolve the issue ourselves. *See Ry. Lab. Execs.' Ass'n v. Burnley*, 839 F.2d 575, 590 n.15 (9th Cir. 1988), *rev'd on other grounds sub nom. Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602 (1989) (appellate

16

court may decide unresolved legal issues without remanding); *UMC Elecs. Co. v. United States*, 816 F.2d 647, 657 (Fed. Cir. 1987), *cert. denied*, 484 U.S. 1025 (1988), *overruled on other grounds by Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55 (1998) (when the facts are undisputed and the issue is solely one of law, the appellate court need not remand but may resolve the issue). We conclude that recognition could not be denied here on a public policy basis. As we explain below, nothing about the Monegasque Proceeding, or Monegasque insolvency law generally, is manifestly contrary to U.S. public policy, and a party's misconduct or bad faith is not a proper basis for invoking § 1506 to deny recognition.

While courts agree that the public policy exception in § 1506 should be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States, *In re ABC Learning Ctrs. Ltd.*, 728 F.3d at 309, *In re Fairfield Sentry Ltd.*, 714 F.3d at 139, *In re Ran*, 607 F.3d at 1021, *Iida v. Kitahara (In re Iida)*, 377 B.R. 243, 259 (9th Cir. BAP 2007), few have addressed the question of when U.S. policy is indeed "fundamental," thus warranting § 1506 protection. Some courts have held that even the absence of certain procedural or constitutional rights will not itself be a bar under § 1506. *See Ad Hoc Grp. of Vitro Noteholders v. Vitro S.A.B. de C.V.* (*In re Vitro S.A.B. de C.V.*), 701 F.3d 1031, 1069 (5th Cir. 2012) (citing *In re RSM Richter Inc. v. Aguilar (In re Ephedra Prods. Liab. Litig.)*, 349 B.R. 333, 336 (S.D.N.Y. 2006) ("[F]ederal courts have enforced against U.S. citizens foreign judgments rendered by foreign courts for whom the very idea of a jury trial is foreign.")). Some courts have held that a difference in foreign law and U.S. law does not mean that recognition would be manifestly contrary to U.S. public policy. *See In re Manley*

*Toys Ltd.*, 580 B.R. 632, 650 (Bankr. D.N.J. 2018) (citing *In re Toft*, 453 B.R. 186, 198 (Bankr. S.D.N.Y. 2011) (collecting cases)), *aff'd,* 597 B.R. 578 (D.N.J. 2019); s*ee also* Guide at ¶ 30 (differences in insolvency schemes do not, without more, justify a finding that enforcing one State's laws would violate the public policy of another State).

Only a handful of courts have addressed whether a foreign debtor's misconduct or "bad faith" is a proper basis for invoking § 1506 to deny recognition. Those that have done so have concluded that misconduct or bad faith, standing alone, is insufficient. *See In re Culligan Ltd.*, No. 20-12192-JLG, 2021 WL 2787926, at *14 (Bankr. S.D.N.Y. July 2, 2021); *In re Manley Toys Ltd.*, 580 B.R. at 648; *In re Creative Fin. Ltd.*, 543 B.R. at 515-16; *In re Millard*, 501 B.R. at 653.

In *Creative Finance*, the bankruptcy court declined to invoke § 1506 to deny recognition even though the case was "the most blatant effort to hinder, delay and defraud a creditor this Court has ever seen." 543 B.R. at 502. The creditor had obtained a $5.6 million judgment in an English court against the two British Virgin Island corporate debtors. *Id.* In accordance with English practice, the judge circulated a draft ruling advising of his decision to enter judgment in favor of the creditor. He further directed that the debtors make payment on the judgment by a date certain, and restrained actions to thwart the judgment that was about to be entered. Between receipt of the draft ruling and the deadline for payment, the debtors' principal caused all of the debtors' liquid assets – over $9.5 million – to be transferred out of the debtors' accounts in the U.K. *Id.*

The debtors' principal then caused the debtors to file an insolvency proceeding in the BVI, and to appoint their own liquidator, who the principal funded but only with enough money to allow the liquidator to comply with the minimum requirements of BVI law. This did not include investigating the $9.5 million fraudulent transfer, or even ascertaining the location and amount of the debtors' assets, much less liquidating them. *Id.* at 502-03. In short, the liquidator did nothing for the benefit of creditors.

The liquidator filed for chapter 15 relief in New York, seeking recognition of the BVI insolvency as a foreign main proceeding. *Id.* at 503. The clear intent of the filing was to block the creditor – the debtors' only non-insider creditor – from enforcing its judgment (which had since been domesticated in the U.S.) against any of the debtors' assets in the United States. As the bankruptcy court summarized, the principal's tactics "were a paradigmatic example of bad faith," and the liquidator's "actions – and inaction – facilitated them." *Id.* The creditor argued that recognition should be denied on public policy grounds due to the debtors' bad faith and the liquidator's actions in furtherance of the debtors' malfeasant goals. *Id.* at 513.

Noting the mandatory nature of recognition and the high bar for invoking § 1506, the *Creative Finance* court refused to deny recognition on public policy grounds for two reasons. *Id.* at 514-16. First, no courts have previously denied recognition on public policy grounds due solely to a party's misbehavior. Second, similar bad faith filings and misconduct by chapter 11 debtors have never been viewed as rising to the level of a public policy violation. "It does not seem right to find a violation of U.S. public policy when U.S. debtors sometimes

engage in the same or similar bad faith, under U.S. law." *Id.* at 516. Consequently, despite how offended the court was by the debtors' and liquidator's conduct, it concluded that invoking § 1506 was not the proper way to deal with it. *Id.* Such issues could be handled, if at all, in the protocols for discretionary relief that chapter 15 affords. *Id.* at 522-23.

In *Millard*, an earlier decision from the bankruptcy judge in *Creative Finance*, the Commonwealth of the Northern Marianas Islands obtained two default tax judgments totaling $36 million against the individual married debtors. 501 B.R. at 646-47. Subsequently, the debtors filed for bankruptcy in the Cayman Islands, and the foreign representative filed a chapter 15 petition in New York for recognition of the Cayman proceeding. *Id.* at 648. The Marianas opposed recognition, arguing that the aim of the petition was to achieve an unsecured stay of enforcement of the tax judgments so that the foreign representative could liquidate the debtors' worldwide assets and move them back to the Caymans, where they would be insulated against the Marianas' claim because foreign tax judgments are unenforceable. *Id.* at 650. The Marianas argued that the foreign representative's "bad faith" goals of obtaining an unbonded stay and insulating assets from legitimate creditor claims were "manifestly contrary" to the public policy of the United States.

Again noting the mandatory nature of recognition and the "narrow" use of the public policy exception in § 1506, the *Millard* court held that it would not consider allegations of bad faith as part of its determination for granting recognition of a foreign proceeding. *Id.* at 653-54. Even if it did, the court did not find the requisite bad faith to invoke § 1506, whether it considered generally the

20

Caymans' insolvency laws and its procedural protections for creditors or the foreign representative's conduct. *Id.* at 651-52, 654. The Marianas made no showing that the country's insolvency laws or procedural protections for creditors were in any way repugnant to U.S. law. *Id.* at 651.

In refusing to deny recognition on the basis of bad faith, the *Millard* court relied on its well-reasoned analysis of the statutory language of § 1517(a) and its use of the term "subject to" before § 1506. *Id.* at 654. The court observed that § 1517(a) is "subject to" only one thing – § 1506 – which "sends a message to the judiciary that *it is not subject to other things that were not so included"* . . . such as the "good cause" requirements, or dismissal for cause requirements, that appear in chapters 7, 11, and 13. *Id.* (emphasis in original). Neither "bad faith" nor "good faith" is stated in § 1517. *Id.* Notwithstanding, the *Millard* court concluded that bad faith may warrant abstention under § 305. *Id.* at 652. If it later appeared that the U.S. or Caymans proceeding was being used to shelter assets in the U.S. without subjecting them to legitimate debts, which the court opined "might well be manifestly contrary to the public policy of the U.S.," the Marianas could seek dismissal of the chapter 15 case under § 305. *Id.*

The bankruptcy court in *Manley Toys* also held that a debtor's bad faith does not rise to the level of a violation of U.S. public policy to deny recognition. 580 B.R. at 648-50. The court interpreted *Creative Finance* as holding that, "when gauging whether to recognize a proceeding, the question under section 1506 is not whether the actions of the debtor violate public policy, but rather whether the foreign tribunal's procedures and safeguards do not comport with United States public policy." *Id.* at 648. In reviewing the debtor's Hong Kong

liquidation proceeding, the *Manley Toys* court found that it was not contrary to U.S. public policy. While Hong Kong's laws relating to fraudulent transfers were not the same as those of the United States, they were not "manifestly contrary" to U.S. law. Instead, they were a different way to achieve similar goals. *Id.* at 649-50. That the debtor and its insiders may have acted in bad faith in other litigation did not mean that the court should not recognize the foreign proceeding. *Id.* at 652.

Finally, the issue of a foreign debtor's "bad faith" in the context of recognition was discussed in *Culligan Limited*. 2021 WL 2787926. In that case, the requirements for recognition of the Bermuda liquidation as a foreign main proceeding were met under § 1517(a), but the objector argued that the court should deny recognition because the petition was filed in bad faith as a litigation tactic, to avoid adverse rulings of the New York court. *Id.* at *7. After reviewing *Creative Finance*, *Manley Toys*, and *Millard*, the bankruptcy court held that a bad faith filing, by itself, will not trigger the public policy exception in § 1506. *Id.* at *14.

Although it was clear that the liquidators sought recognition as a litigation strategy and their action might constitute bad faith under a different chapter in the Code, the *Culligan Limited* court reasoned that § 1506 does not examine whether the debtor's actions violate public policy. Rather, it examines whether the foreign court's procedures and protections do not comport with U.S. public policy. *Id.* at *16 (citing *In re Manley Toys Ltd.*, 580 B.R. at 648). No party had asserted that the Bermuda proceedings were, by their nature, contrary to U.S. public policy. *Id. See also In re Loy*, 380 B.R. 154, 168-69 (Bankr.

E.D. Va. 2007) (noting that § 1517(a) does not contain language suggesting that a court is permitted to include equitable considerations such as "unclean hands" in its determination of whether the requirements for recognition of a foreign proceeding have been met); Guide at ¶ 161 (stating that nothing in the Model Law suggests that extraneous circumstances such as "abuse of process" should be taken into account on a recognition application).

We agree with the reasoning of *Creative Finance, Millard, Manley Toys,* and *Culligan Limited*, that a party's misconduct or "bad faith," standing alone, is not a proper basis for invoking the public policy exception in § 1506 to deny recognition.[8] Even if we were to hold otherwise, the conduct here, while objectionable, did not rise to the level of a violation of U.S. public policy, and certainly not "manifestly" so. On far more egregious facts, the court in *Creative Finance* refused to deny recognition on the basis of bad faith. 543 B.R. at 516. Here, we have the filing of a foreign insolvency proceeding and a chapter 15 case that were clearly designed to thwart the collection efforts of the debtor's largest creditor. However, this is not unique. Bankruptcies are filed in the United States under other chapters for the same purpose, but the petition may still be filed. We also have a trustee getting paid by the debtor's principal to prosecute the foreign proceeding and who is unlikely to pursue any potential claims that may be available against the debtor's insiders for the benefit of

---

[8] The one instance where courts have invoked § 1506 for bad faith in a petition for recognition is when a debtor has improperly manipulated its center of its main interests (COMI) for the purpose of getting recognition of the foreign insolvency as a "foreign main proceeding" in chapter 15. *See In re Creative Fin. Ltd.,* 543 B.R. at 523-24 (discussing cases). We offer no opinion on this issue since Black Gold's COMI of Monaco was not disputed.

creditors. On the other hand, while IPAC "suspects" that the Napoleonis have engaged in fraudulent transfers to leave Black Gold an empty shell, it provided no direct evidence of the alleged transfers. This is unlike *Creative Finance*, where there was clear evidence of a fraudulent transfer, the principal's intent to defraud creditors, and the liquidator's intent to facilitate it. Perhaps the most troubling fact here was that Mr. Samba's attorneys were less than candid about their clients and the nature of the representations. But that is not enough, and that matter can be dealt with in other ways.

We reach the same conclusion if we consider Monegasque insolvency law and its safeguard protections, or lack thereof, for creditors. Nothing about Monegasque insolvency law rises to the level of being "manifestly contrary to the public policy of the United States." IPAC notes that no U.S. court has recognized a Monaco foreign main proceeding in a chapter 15 case. That may be, but it does not mean that such proceedings should not be recognized. While different in some respects, the administration of an insolvency proceeding under Monegasque law is not inconsistent with how bankruptcy cases are administered in the U.S. We acknowledge, for example, that Monegasque law has no analog to Rule 2004, no concept equivalent to abandonment, the automatic stay does not terminate once the insolvency case is closed, and does not provide for a legal theory of alter ego. However, as we noted above, the absence of certain procedural or constitutional rights or differences in insolvency schemes will not bar recognition under the public policy exception in § 1506. *See In re Vitro S.A.B. de C.V.*, 701 F.3d at 1069 (citing *In re Ephedra Prods. Liab. Litig.*, 349 B.R. at 336); *see also In re Manley Toys Ltd.*, 580 B.R. at 650 (citing

24

*In re Toft*, 453 B.R. at 198 (collecting cases)); Guide at ¶ 30. IPAC's inability to collect the Judgment from Black Gold or to pursue the Napoleonis on an alter ego theory for that debt does not strike us as a "matter of fundamental importance for the United States" that would compel invoking § 1506.

The bankruptcy court correctly observed that the differences between the procedural and substantive aspects of Monegasque insolvency law and U.S. bankruptcy law are tolerable. As then-Judge Cardozo stated so eloquently over 100 years ago:

> Our own scheme of legislation may be different. . . . That is not enough to show that public policy forbids us to enforce the foreign right. . . . If a foreign statute gives the right, the mere fact that we do not give a like right is no reason for refusing to help the plaintiff in getting what belongs to him. We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home.

*Loucks v. Standard Oil Co.*, 120 N.E. 198, 201 (N.Y. 1918).

This is not to say that the court is helpless when faced with misconduct or bad faith in a chapter 15 case. After a petition for recognition has been granted, the court has a considerable amount of discretion. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. at 333 (while recognition turns on strict application of objective criteria in § 1517, post-recognition relief is "largely discretionary and turns on subjective factors that embody principles of comity"). After recognition, chapter 15 has other tools available to deal appropriately with misconduct and cases filed in bad faith. *In re Creative Fin. Ltd.*, 543 B.R. at 522-23. For example, a court can entertain

abstention and dismissal under § 305. *See* §§ 305(a)(2) & 1529(4).[9] The court can also grant relief from stay under § 362(d)(1) "for cause." Once recognition is granted, § 1520 provides the debtor with a variety of relief, including the imposition of the automatic stay under § 362. § 1520(a)(1). While the court in *Creative Finance* observed that relief from stay might not be a fully satisfactory substitute for keeping bad faith actors out of U.S. courts, § 362(d)(1) provides at least one means to ensure that U.S. courts are not completely helpless to deal with instances of bad faith. 543 B.R. at 523. Finally, § 1517(d) offers the remedy of modifying or terminating recognition if the grounds for granting it were fully or partially lacking or have ceased to exist.

## CONCLUSION

We conclude that § 1501 was not a proper basis upon which to deny recognition of the Monegasque Proceeding, and the bankruptcy court erred in applying it as such when the requirements of § 1517(a) were met. If recognition could be denied at all, the court was limited to the public policy exception in § 1506 as a basis for doing so. We conclude that § 1506 was not applicable on these facts. Accordingly, we REVERSE.

---

[9] Section 305(a)(2) provides, in relevant part, that the court may dismiss or suspend a chapter 15 case at any time if: (A) a petition for recognition of a foreign proceeding has been granted; and (B) the purposes of chapter 15 would be best served by such dismissal or suspension. Section 1529(4) additionally provides that "the court may grant any of the relief authorized under section 305."